IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN-RYAN WHITE,　　　　　:
   Plaintiff,　　　　　　　　　:
　　　　　　　　　　　　　　　:
   v.　　　　　　　　　　　　:　　CIVIL ACTION NO. 25-CV-6665
　　　　　　　　　　　　　　　:
UPPER DARBY TOWNSHIP, *et al.*,　:
   Defendants.　　　　　　　　:

<u>MEMORANDUM</u>

WEILHEIMER, J.　　　　　　　　　　　　　　　JANUARY 28, 2026

　　　Shawn Ryan-White filed this *pro se* action alleging his constitutional rights were violated in connection with a family dispute over a property that led to his alleged unlawful arrest. White seeks leave to proceed *in forma pauperis*. For the following reasons, leave to proceed *in forma pauperis* will be granted, and the Complaint will be dismissed.

## I.　FACTUAL ALLEGATIONS[1]

　　　White names the following Defendants in his Complaint: Upper Darby Township ("Upper Darby"), Upper Darby Police Department Officers Sergeant Francis Devine, Sergeant Michael DeHoratius, and John Doe Police Officers (the "Police Officer Defendants"), Upper Darby Department of Licenses and Inspections ("L&I") Director Daniel Knowles, Attorney Elizabeth T. Stefanide, Edward Fasbinder, identified as his maternal uncle, and Bonnie Jennings and Elaine Kay, identified as his maternal aunts. (*See* Compl. at 2-3, 5, 11)

---

[1] The factual allegations are taken from White's Complaint ("Compl."), which consists of nineteen typewritten pages. (ECF No. 2.) The Court adopts the sequential pagination assigned by the CM/ECF docketing system. Where the Court quotes from the Complaint, punctuation, spelling, and capitalization errors will be cleaned up. The Court may also consider matters of public record when conducting a screening under § 1915. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *see also Orabi v. Att'y Gen.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014) ("We may take judicial notice of the contents of another Court's docket.").

White's allegations are detailed and stem from a family dispute over his residence, located at 7000 Greenwood Avenue, Upper Darby Township, Pennsylvania (the "Property"), in Delaware County. (*Id.* at 4.) He alleges, in relevant part, that the Property belonged to his mother, Teresa White, and was "solely titled" in her name. (*Id.*) He has "virtually always maintained his residence" as the Property with the "express permission and authority of his Mother," including when he went to law school in Harrisburg.[2] (*Id.*) He asserts he was appointed as durable power of attorney over his mother's estate in early August 2023. (*Id.* at 6.)

However, on August 22, 2023, White was temporarily evicted from the Property by Upper Darby Township police officers after his maternal aunts, Defendant Jennings and Barbara Troop,[3] petitioned and successfully obtained a temporary state court order against him pursuant to the Pennsylvania Protection From Abuse Act (the "PFA Order"). (*Id.* at 5-6.) White alleges that Jennings and Troop procured the PFA Order "through the vehicle" of his mother, "by their undue influence and for purposes of removing him" from the Property, because wanted to "readily dispose of it and its contents as they pleased." (*Id.* at 5.) He avers on November 16, 2023, a final hearing was held on the PFA Order, which resulted in a favorable disposition in his favor and the Order was vacated. (*Id.* at 7.) Because the PFA Order was vacated, he returned to the Property on November 19, 2023. (*Id.*) However, while the PFA was pending, Jennings through her attorney Defendant Stefanide filed for guardianship over his mother and her estate, including the Property, which they obtained on October 3, 2023. (*Id.* at 8-9.) He asserts that Jennings retained Stefanide to countermand his power of attorney and control his mother's

---

[2] In his motion to proceed *in forma pauperis*, White states that he is currently temporarily suspended from practicing law. (*See* ECF No. 1 at 5.)

[3] Although White does not name Troop as a defendant, the Court will treat her as a defendant out of an abundance of caution.

estate, obtaining the guardianship by making fraudulent representations in the Delaware County

Orphans' Court, such as alleging that White physically and financially abused his mother. (*Id.* at

7-8.) Prior to returning to the Property on November 19, 2023, White believes Jennings and/or

the other family member defendants put his and his mother's belongings in trash bags outside

and changed the lock on the front door of the Property to prevent him from returning. (*Id.* at 8-

9.)

On November 21, 2023, White left the Property to file an appeal of the guardianship

granted to Jennings[4] and asked his friend to stay at the Property while he was gone in

anticipation that his family "would continue to seek his removal by any means at their disposal."

(*Id.* at 9.) That same day, when he returned to the Property after filing his appeal, White alleges

his friend was gone and the front door was removed. (*Id.* at 10.) He later learned Upper Darby

police officers were at the Property while he was gone and arrested his friend for trespassing.[5]

(*Id.* at 11.) While he was attempting to reinstall the front door, Defendants Kay and Fasbinder

arrived at the Property and Kay demanded that he leave. (*Id.*) White did not leave and alleges

that shortly after, Upper Darby police officers surrounded the Property and demanded he come

out of the Property "with his hands up in the air." (*Id.* at 12.) At this time, he was not aware that

---

[4] A review of the public records corroborates that White appealed the guardianship order to the Superior Court of Pennsylvania and reflects that his appeal was dismissed for his failure to file a brief. *See In Re: Est. of T.W., Appeal of: S.-R.W.*, 2967 EDA 2023 (Pa. Super. Ct.). It appears White filed other appeals and requests related to the guardianship order that were dismissed for the same reason. *See In Re: Est. of T.W., Appeal of: S.-R.W.*, 3159 EDA 2023 (Pa. Super. Ct.); *In Re: Est. of T.W., Appeal of: S.-R.W.*, 3160 EDA 2023 (Pa. Super. Ct. O.C.).

[5] White alludes to this event as the first time officers entered the Property and arrested his friend as without just cause. (Compl. at 9-10.) However, to the extent he is attempting to do so, White may not pursue claims or seek damages based on harm allegedly suffered by his friend. *See generally Twp. of Lyndhurst, N.J. v. Priceline.com, Inc.*, 657 F.3d 148, 154 (3d Cir. 2011) ("[A] plaintiff must assert his or her own legal interests rather than those of a third party" to have standing to bring a claim) (quotations omitted).

the police officers had been there earlier in the day when his friend was arrested and claims he "responded by screaming back something to the effect of 'Why? I live here?'" (*Id.* at 11-12.) He was not sure if the police heard him, but "almost simultaneously, [he] heard a very large smashing or crashing sound" that he believed was the rear basement door "being bashed in" by the police officers. (*Id.* at 12.) He alleges he "very cautiously made his way down the basement steps with his hands raised in the air informing the home invaders that he was coming down the steps with his hands up" in order to de-escalate the situation. (*Id.*) He claims when he entered the basement, he asked the officers to "calm down and begged them not to shoot him and expressed his desire to comply with their demands." (*Id.*) A police officer, identified as Sergeant Doe, entered the basement, maintaining a distance of about ten feet from White, and ordered him "to lay face down on the ground" while pointing a firearm at him. (*Id.* at 12-13.) White asserts he complied with the order to lay down and was "at all times peaceful and compliant" with the police officers. (*Id.* at 13.) White, who was still wearing a book bag from earlier, alleges his "hands were tightly handcuffed behind his back" by Sergeant Doe while he lied face down on the basement floor and "gave no resistance whatsoever." (*Id.*) He was removed from the Property, patted down, then placed in the police vehicle and transported to the police station. (*Id.* at 14.) When he arrived at the police station, "he was unhandcuffed and place in a small approximately 5'x7' room and stripped searched," removing all his clothes except his underwear. (*Id.* at 15.) He alleges he was "held in this room for the next approximately 3-5 hours." (*Id.*) He was informed by the officer who drove him to the station that the police intended to charge him with criminal trespassing, "that his aunt and uncle, [Kay] and [Fasbinder] had relayed to officers that he was in violation of a PFA order." (*Id.* at 14.) White told the officers that he was not trespassing and lawfully present at the Property by

showing them a copy of the November 16, 2023, Order dismissing the PFA Order. (*Id.*) He claims he "repeatedly implored" the officers to check the PFA database and they "failed to consider or check for the cessation" of the PFA Order. (*Id.* at 18.) However, he also alleges that he was "informed that he was not going to be criminal charged with trespassing after all, in light of the documentation he provided to the officers." (*Id.* at 15.)

Although he was released, White was told that he was "prohibited from re-entering his home because it had been declared condemned as 'uninhabitable' by the Upper Darby Department of Licenses and Inspections." (*Id.*) Police officers allowed him to briefly return to the Property to retrieve his belongings, where he saw a "cease and desist" form citing "deplorable conditions." (*Id.* at 16.) He alleges the condemnation of the Property was "imposed solely as an alternative means of precluding [him] from lawfully returning to his domicile and residence, and this 'solution' was agreed upon by the aforementioned Police Officer state actors under color of law and in coordination with the private named defendants." (*Id.* at 15.) He claims agents of the L&I, through the direction of Defendant Knowles, made the decision to condemn the Property and Knowles "wrongfully, pretextually, and without any actual inspection or due process of law order[ed] the condemnation of the property in coordination with the aforementioned actors, and for their agreed upon purpose jointly, that being [his] removal and the preclusion of his lawful right to return" to the Property. (*Id.* at 16.)

White asserts that the next day, November 22, 2023, he went to the L&I Office and spoke with Knowles, who relayed "his mistaken belief that the [Property] was without utilities." (*Id.* at 17.) White informed Knowles that the Property did have properly working utilities, explained the alleged ongoing conspiracy of the other Defendants to remove him from the Property, and requested that he undo the condemnation order. (*Id.*) White alleges that Knowles and Stefanide

engaged in a phone call, presumably to discuss his request to undo the condemnation order. (*Id.*)
After the call, he claims Knowles informed him that there would be an inspection scheduled the
following week and he could attend. (*Id.*) White believes no inspection ever took place, and
since these events, the Property has been "boarded up and abandoned." (*Id.*) He also indicates
that on September 16, 2024, Stefanide petitioned the state court for permission to sell the
Property after Jennings "as court-appointed guardian" entered an agreement to sell it on July 13,
2024. (*Id.* at 8 n.2.) He alleges the state court granted the request, which he opposed, and he has
appealed the state court's order authorizing the sale of the Property. (*Id.*) A review of public
records indicates the appeal is still pending, and that White's emergency requests for relief were
denied. *See In Re: Est. of T.W., Appeal of: S.-R.W.*, 3220 EDA 2024 (Pa. Super. Ct. Dec. 10,
2024).

As a result of these events, White alleges Defendants "all conspired and coordinated – on
multiple occasions to effectuate [his] wrongful removal by any means, and the private actors are
liable also in like manner due to these agreements and concerted actions taken together
knowingly." (Compl. at 18.) In addition to the conspiracy allegations, White brings claims for
denial of due process under the Fourteenth Amendment, municipal liability under *Monell*, Fourth
Amendment violations for malicious prosecution,[6] excessive force, wrongful arrest, false

---

[6] To state a Fourth Amendment malicious prosecution claim, a plaintiff must plausibly
allege that a government official charged him without probable cause, leading to an unreasonable
seizure of his person. *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024) (citing
*Thompson v. Clark*, 596 U.S. 36, 43 & n.2 (2022)). White's malicious prosecution claim is not
cognizable because he alleges that he was "informed that he was not going to be criminal
charged with trespassing after all, in light of the documentation he provided to the officers."
(Compl. at 15.) Because he was not criminally charged, his malicious prosecution claim will be
dismissed.

imprisonment, and other claims under state law. (*Id*).  He seeks money damages and injunctive

relief allowing him to re-enter the Property.[7] (*Id*.)

## II.    STANDARD OF REVIEW

The Court grants White leave to proceed *in forma pauperis* because it appears that he is

incapable of paying the fees to commence this civil action.  Accordingly, 28 U.S.C. §

1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim.  Whether

a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard

applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher*

*v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether

the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v.*

*Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  At this early stage of the litigation, the Court will

accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the

plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible

---

[7] To the extent White is requesting relief from the state court's order granting Jennings guardianship over the Property, including her right to sell the Property, which is pending appeal, the Court does not have jurisdiction to grant such relief.  In *Princess Lida of Thurn & Taxis v. Thompson*, the Supreme Court held courts are prevented from exercising jurisdiction when a court in a previously filed action is exercising control over the property at issue and the second court must exercise control over the same property in order to grant the relief sought, even where the property has not actually been seized. 305 U.S. 456, 466 (1939). Applying this principal, the Third Circuit recently held a district court lacked jurisdiction to hear a party's suit brought under section 1983 where the party asked the district court "to order the distribution of specific property subject to the jurisdiction of the Orphans' Court" because "[t]o grant the relief sought by the plaintiffs, the District Court would have had to exercise control over the shares of stock at issue." *Dyno v. Dyno*, No. 20-3302, 2021 WL 3508252, at \*3 (3d Cir. Aug. 10, 2021) (*per curiam*); *see also Lefkowitz v. Bank of New York*, 528 F.3d 102, 107 (2d Cir. 2007) (concluding that providing requested specific performance and declaratory relief would require the federal court "to assert control over property that remains under the control of the state courts").  Like in *Dyno*, the Court does not have jurisdiction to exercise control over the Property.

claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024).  Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

As the Supreme Court has recognized, *pro se* pleadings are different from "formal pleadings drafted *by lawyers*."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  "The requirement that courts construe *pro se* pleadings liberally does not ordinarily apply to *pro se* lawyers." *Spence v. United States Dep't of Veterans Affs.,* 109 F.4th 531, 538 (D.C. Cir. 2024), *cert. denied sub nom. Spence v. Dep't of Veterans Affs.,* 145 S. Ct. 594 (2024); *see also, e.g., Erb v. Thompson,* No. 23-329, 2025 WL 3124152, at *5 (W.D. Wis. Nov. 7, 2025) (citing *id.* and *Godlove v. Bamberger, Foreman, Oswald, & Hahn*, 903 F.2d 1145, 1148 (7th Cir. 1990) ("Ordinarily, we treat the efforts of pro se applicants gently, but a pro se lawyer is entitled to no special consideration.")); *McElwee v. Aldersgate Life Plan Servs., Inc.,* No. 24-00288, 2024 WL 4438673, at *1 (W.D.N.C. Oct. 7, 2024).  However, although a legally trained *pro se* litigant is not afforded liberal construction, the Court will nevertheless construe his complaint "so as to do justice." *Spence,* 109 F.4th at 538 (quoting Fed. R. Civ. P. 8(e)).

Furthermore, the Court must dismiss any claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues *sua sponte*").  A plaintiff commencing an action in federal court bears the burden of establishing federal jurisdiction. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) ("The burden of establishing federal jurisdiction rests with the party asserting its existence.").

The Court's continuing obligation to assure its jurisdiction includes an assessment of whether a case has become moot. *See Seneca Res. Corp. v. Twp. of Highland, Elk Cty., Pa.*, 863 F.3d 245, 252 (3d Cir. 2017) ("Our 'continuing obligation' to assure that we have jurisdiction requires that we raise issues of standing and mootness sua sponte.").

## III.     DISCUSSION

White asserts his constitutional claims pursuant to § 1983, the vehicle by which such claims may be brought against state actors in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, and, therefore, a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998); *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).

### A.     Section 1983 Conspiracy Claims and Individual Claims Against Defendants Stefanide, Jennings, Kay, Troop, and Fasbinder

White seeks to bring constitutional claims against Stefanide, the private attorney representing Defendant Jennings in the guardianship case over White's mother and her estate, which includes the Property. Private attorneys are not state actors. *See, e.g., Gannaway v. Stroumbakis*, 842 F. App'x 725, 730 (3d Cir. 2021) (*per curiam*) (noting that "[a] privately retained attorney clearly does not act under color of state law, and . . . that 'no color of state law attache[s] to the functions of court-appointed counsel.'"); *Coulter v. Allegheny Cnty. Bar Ass'n*,

496 F. App'x 167, 169 (3d Cir. 2012) (*per curiam*) (none of the defendants named, including an attorney, his law firm, the Pennsylvania Bar Association, the Allegheny County Bar Association or its three individual members, were state actors for purposes of Section 1983); *Runge v. Kelly*, No. 05-10849, 2006 WL 167497, at *2 (D. Mass. Jan. 23, 2006) (dismissing § 1983 claims against private attorney who procured order appointing him as plaintiff's guardian because "[a] private party's abuse of a valid state procedure does not . . . implicate state action"). Thus, the claims against Stefanide will be dismissed.

White's constitutional claims against his family members, Jennings, Kay, Troop, and Fasbinder, are not plausible because they also are not state actors for purposes of § 1983. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (explaining that state action is a "threshold issue" for § 1983 claims). "Whether a defendant is acting under color of state law – *i.e.*, whether the defendant is a state actor – depends on whether there is "such a close nexus between the State and the challenged action' that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted). In assessing whether a private party's action constitutes state action the Court will consider: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted). To support a finding of state action, "the government must be 'responsible for the specific conduct of which the plaintiff complains.'" *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

None of those criteria is met here.  Jennings, who is the guardian in the lawsuit over White's mother and her estate, is a private individual and accusations that she has made fraudulent allegations or taken action to deprive White of the Property during the course of the state court proceedings, does not make her a state actor for purposes of § 1983.  *See e.g., Gueson v. Feldman*, No. 00-1117, 2001 WL 34355662, at *10 (E.D. Pa. Nov. 30, 2001) ("Filing a lawsuit in state court, is not for 1983 purposes 'state action;' nor does it turn a private citizen into a state actor."); *Smith v. Wood*, 649 F. Supp. 901, 906 (E.D. Pa. 1986) (family members who invoked Pennsylvania's guardianship laws resulting in a ruling that plaintiff was incompetent to manage his estate were not state actors "[m]erely because a judicial determination was required").  The same is true for Troop, who petitioned for the PFA Order with Jennings, and Kay and Fasbinder, who have also allegedly taken actions to keep White off the Property by calling the police with false information when he was at the Property on November 21, 2023, that ultimately led to his arrest.  "Merely giving information to police officers is insufficient to convert a private party into a state actor."  *Simmer v. Kehler*, No. 15-2285, 2015 WL 6737017, at *3 (D.N.J. Nov. 2, 2015) (collecting cases); *see also, e.g. Yoast v. Pottstown Borough*, 437 F. Supp. 3d 403, 420 (E.D. Pa. 2020) ("Providing false information to the police -- even deliberately -- does not transform a private party into a state actor."), *aff'd,* No. 22-1960, 2023 WL 4418213 (3d Cir. July 10, 2023);  *Cvetko v. Derry Twp. Police Dep't*, No. 09-1260, 2010 WL 1791140, at *4 (M.D. Pa. May 4, 2010) ("[A] private actor does not proceed under color of state law merely by furnishing the police with information pertaining to a possible public disturbance.").

Nor can Jennings, Kay, Troop, Fasbinder, and Stefanide be considered state actors based on White's allegations of conspiratorial conduct because he has failed to state a conspiracy claim

under § 1983. Seeming to recognize the fact that these Defendants are private citizens and do not qualify as state actors for purposes of § 1983, White attempts to assert this claim based on his allegation that these non-state actor Defendants "conspired and coordinated" with the state actor Defendants, to deprive him of the Property in an attempt to nudge his claims from the possible to the plausible. As an initial matter, a "bare assertion of conspiracy" does not suffice to state a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Furthermore, "'[a] conspiracy cannot be found from allegations of judicial error, ex parte communications (the manner of occurrence and substance of which are not alleged) or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions.'" *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009) (*per curiam*) (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1480-81 (10th Cir. 1990)). Rather, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010). White's allegations of conspiracy are essentially predicated on these Defendants' actions related to keeping him from residing at the Property, such as Jennings and Troop obtaining the PFA Order temporarily evicting him from the Property then Jennings subsequently obtaining guardianship in state court through Stefanide, the L&I inspection deeming the Property inhabitable, and the other Defendants assisting in assuring that he was not allowed on the Property since he is not the guardian over the Property. White has not pleaded any facts that plausibly suggest a meeting of the minds between Jennings, Kay, Troop, Fasbinder, Stefanide, the police officers, Knowles, and the other defendants. *See Twombly,* 550 U.S at 556 (holding that a plaintiff claiming conspiracy must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"). The Complaint sets forth merely a

"conclusory allegation of agreement at some unidentified point[, which] does not supply facts adequate to show illegality." *Id.* at 557.  Specifically, White has failed to allege any facts to support a conspiracy, such as the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy. *See Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166 (3d Cir. 1989) ("To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose."), *abrogated on other grounds by Beck v. Prupis,* 529 U.S. 494 (2000).  The mere fact that the state court proceedings resulted in the PFA Order against White evicting him from the property then subsequently granting Jennings guardianship over White's mother and her estate, which includes the Property, and that the other defendants abided by such rulings, are not sufficient to allege plausibly the existence of a conspiracy. *See, e.g., Dennis v. Sparks*, 449 U.S. 24, 28 ("[M]erely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge."); *Great W. Mining,* 615 F.3d at 179 (holding that conspiracy claim was not plausible where plaintiff "failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement . . . , the period of the conspiracy, or the object of the conspiracy"); *Stephens v. Kenney*, 802 F. App'x 715, 720 (3d Cir. 2020) (*per curiam*) (conclusory allegations that guardian and attorney conspired with state actor to deprive plaintiff of due process did not state a basis for state action); *Young v. Kann,* 926 F.2d 1396, 1405 n.16 (3d Cir. 1991) (plaintiff cannot rely exclusively "upon his own suspicion and speculation" to establish a conspiracy claim).  White's allegations merely assume the existence of a conspiracy rather than alleging one and therefore do not state a claim for conspiracy under § 1983.  In sum, White's allegations of conspiracy are

insufficient either as a basis for a conspiracy claim or as a basis for finding that the private

defendants may be considered state actors for purposes of § 1983. *See generally Iqbal*, 556 U.S.

at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it

stops short of the line between possibility and plausibility of entitlement to relief.") (internal

quotations omitted); *see also Twombly*, 550 U.S. at 570 ("Because the plaintiffs here have not

nudged their claims across the line from conceivable to plausible, their complaint must be

dismissed.").

     **C.**     **Fourteenth Amendment Claims against Knowles**

     The Fourteenth Amendment provides that no state shall "deprive any person of life,

liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It appears White

attempts to state a claim against Knowles for a violation his procedural due process rights based

on the condemnation of the Property. (*See* Compl. at 16.) To state a claim under § 1983 for a

violation of one's procedural due process rights, "a plaintiff must allege that (1) he was deprived

of an individual interest that is encompassed within the Fourteenth Amendment's protection of

'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of

law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v.*

*Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). The Fourteenth Amendment's protections encompass

real property. *See Nicholas v. Penn. State Univ.*, 227 F.3d 133, 141 (3d Cir. 2000).

     "The fundamental requirement of due process is the opportunity to be heard at a

meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Thus, a deprivation of property should "be preceded by notice and opportunity for hearing

appropriate to the nature of the case." *Cleveland Bd. Educ. v. Loudermill*, 470 U.S. 532, 542

(1985) (citation omitted). "Due process does not require that a property owner receive actual

notice before the government may take his property." *Jones v. Flowers*, 547 U.S. 220, 226

(2006) (citation omitted).  Rather, due process requires the government to "provide notice

reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections."  *Id.* (internal quotation

marks and citation omitted).  "In emergency situations, where quick action is necessary and pre-

deprivation process impractical, the state satisfies due process by providing some meaningful

means by which to assess the propriety of the state's action at some time after the initial taking."

*Dvortsova v. City of Philadelphia*, 585 F. Supp. 3d 723, 730-31 (E.D. Pa. 2022) (internal

quotations and alterations omitted).

     White alleges that on the date of his arrest, police officers informed him that he was

"prohibited from re-entering his home because it had been declared condemned as

'uninhabitable' by the Upper Darby Department of Licenses and Inspections."  (Compl. at 15.)

He was allowed to return to the Property to retrieve his belongings, where he saw a "cease and

desist" form citing "deplorable conditions."  (*Id*. at 16.)  White asserts that the next day, on

November 22, 2023, he went to the L&I Office and spoke with Knowles, who relayed "his

mistaken belief that the [Property] was without utilities."  (*Id*. at 17.)  White informed Knowles

that the Property did have properly working utilities, explained the alleged ongoing conspiracy of

the other Defendants to remove him from the Property, and requested that he undo the

condemnation order.  (*Id*.)  White admits that Knowles, after speaking with Stefanide, informed

him that there would be an inspection scheduled the following week and he could attend.  (*Id*.)

White "believes" no inspection ever took place, without factual allegations to support such

belief, and alleges that the Property has been "boarded up and abandoned ever since."  (*Id*.)  As a

result, White claims Knowles directed his agents to condemn the Property and he "wrongfully,

pretextually, and without any actual inspection or due process of law order the condemnation of

the property in coordination with the aforementioned actors, and for their agreed upon purpose jointly, that being [his] removal and the preclusion of his lawful right to return" to the Property. (*Id.* at 16.)

Assuming, without deciding, that White has a property interest in the Property that Jennings currently has guardianship over, White's allegations show that he had an adequate opportunity to be heard when discussing the condemnation with Knowles and was given notice by him that he believed the Property was condemned. Knowles also gave White notice that the inspection was scheduled, and he was allowed to be present. Whether he "believes" the inspection actually took place or not is not sufficient to allege a due process violation. *See Twombly, e.g.,* 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully.") (internal quotation marks and citations omitted). Furthermore, he was also given notice regarding the condemnation order not only by the police officers on November 21, 2023, but also when he went to the Property that same date and saw the "cease and desist" sign declaring the Property as "deplorable conditions." White's own allegations show that he was provided sufficient notice of the condemnation order and an adequate opportunity to be heard by Knowles. Therefore, the Fourteenth Amendment claims against Knowles will be dismissed.[8]

---

[8] The substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that "shocks the conscience." *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994). Although it also does not appear White intended to bring a substantive due process claim, even if he did, White's allegations regarding Knowles's action fails to rise to the level of conscious-shocking behavior. Knowles took the time to meet with White, explained his belief that the Property did not have

**D.    Fourth Amendment Claims**

The Police Officer Defendants, in their respective individual capacities, are state actors who may be liable under § 1983.  White specifically names Sergeant Devine, Sergeant DeHoratius, and John Doe Police Officers in the heading of his Complaint.  He makes factual allegations against the police officer who arrested him at the Property and the police officer who drove him to the station, referring to those officers as Sergeant John Does.  It appears those officers may be Sergeant Devine and Sergeant DeHoratius.  In any event, regardless of the actual names of the officers involved in the Fourth Amendment claims, they fail for the reasons set forth below.  If those are not the names of the Sergeant John Does, he failed to allege any factual allegations against Sergeant Devine and Sergeant DeHoratius to show personal involvement of those defendants, which is a required element and also fatal to his claims.  *See Rode,* 845 F.2d at 1207.

**1.    False Arrest and Imprisonment Claims**

"False arrest and false imprisonment are 'nearly identical claims' that are 'generally analyzed together.'"  *Karkut v. Target Corp.,* 453 F. Supp. 2d 874, 879 (E.D. Pa. 2006) (quoting *Brockington v. Phila.,* 354 F. Supp. 2d 563, 570 n. 8 (E.D. Pa. 2005) (citation omitted)).  To state a claim for false arrest and related false imprisonment under the Fourth Amendment, a plaintiff must allege facts establishing that he was arrested without probable cause.  *See Orsatti v. N.J. State Police,* 71 F.3d 480, 482 (3d Cir. 1995).  "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the

---

working utilities, and scheduled an inspection after White requested reconsideration of the condemnation order.  This was not arbitrary conduct.

person to be arrested." *Id.* at 483.  "Therefore, White must allege facts sufficient to support a reasonable inference that the Police Officer Defendants acted without probable cause.  Courts "consider the existence of probable cause via a 'common sense approach' based on the totality of the circumstances, and viewed from the perspective of an objectively reasonable police officer." *Young v. City of Pittsburgh*, 562 F. App'x 135, 140 (3d Cir. 2014) (internal citation omitted). The standard is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).

"Under Pennsylvania law, a person commits criminal trespass if he enters or breaks into 'any building or occupied structure or separately secured or occupied portion thereof' while 'knowing that he is not licensed or privileged to do so.'" *Eaton v. Figaski*, No. 21-3094, 2022 WL 17831444, at *4 (3d Cir. Dec. 21, 2022) (quoting 18 Pa. Cons. Stat. § 3503(a)(1)).  It "merely requires proof of scienter, in other words, that the defendant had knowledge of a lack of license or privilege to enter." *Id.* (quoting *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005), *abrogated on other grounds by Rivera-Guadalupe v. City of Harrisburg,* 124 F.4th 295 (3d. Cir. 2024)).

According to the Complaint, White admits on August 22, 2023, he was temporarily evicted from the Property by Upper Darby police officers after his aunts petitioned and successfully obtained a temporary PFA Order. (*See* Compl. at 5-6.)  On November 16, 2023, a final hearing was held on the PFA Order, which he claims resulted in a favorable disposition in his favor and the Order was vacated. (*Id.* at 7.)  Because the PFA Order was vacated, he returned to the Property on November 19, 2023. (*Id.*)  He acknowledges however, that while the PFA was pending, his aunt obtained a court order on October 2, 2023, granting her a guardianship

over his mother and her estate, which included the Property. (*Id.* at 8-9.) When he returned to the Property on November 21, 2023, after filing an appeal of the guardianship order, he admits that one of his aunts, Kay, demanded that he leave the Property. (*Id.* at 11.) White did not leave and alleges that shortly after, Upper Darby police officers surrounded the Property and demanded he come out of the Property. (*Id.* at 12.) He was ultimately arrested and taken to the police station, and told that the police intended to charge him with criminal trespassing, "and that his aunt and uncle, [Kay] and [Fasbinder] had relayed to officers that he was in violation of a PFA order." (*Id.* at 14.) White told the officers that he was not trespassing because the PFA Order was dismissed, and he was ultimately not charged criminally. (*Id.* at 15.) It is also apparent from the Complaint that the police were aware that the property had been condemned.

Under the facts White alleges, although the PFA Order had been dismissed a few days prior to his arrest, he admitted that he knew guardianship of the Property had been granted to Jennings and was still pending, hence why he left the day of his arrest to appeal it. He had also been asked to leave by Kay the day of his arrest, who he alleges did not want him at the Property like Jennings. He further alleges that *after the arrest*, the police explained that Kay and Fasbinder called the police informing them he was in violation of the PFA Order, and they intended to criminally charge him. These allegations make it clear that the police officers who arrested White believed at the time of the arrest he was trespassing under the PFA Order. *See Wright*, 409 F.3d at 602 (explaining that the probable cause standard is met when officers "if at the moment the arrest was made ... the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.") (cleaned up). Even though the PFA Order was allegedly no longer in effect, White informed the officers of this

*after the arrest*.  It is also important to note that Upper Darby Police Officers had previously

been involved in his eviction from the Property in August based on the PFA Order, meaning they

were aware to some extent of the underlying family dispute, and it is clear they believed that the

Order was still intact at the time of the arrest, adding to their reasonable belief that White was

not allowed there and was trespassing.  *See Turkos v. Dupont Borough,* 721 F. App'x 208, 213

(3d Cir. 2018) ("The focus of the probable cause inquiry is the information available to officers

"at the time the charges were filed, not whether, in retrospect, the PFA was actually valid in May

2013.")  Furthermore, given that White had been asked to leave by Kay and knowing that

Jennings successfully obtained guardianship of the Property, which he sought to appeal, White

was clearly aware that he was not legally permitted to be there.  The facts alleged in the

Complaint reflect that the Police Officer Defendants had probable cause to arrest White for

trespassing based on what they knew at the time of the arrest, even assuming they made a factual

or legal mistake.  In other words, under these circumstances, the arrest was justified.

Accordingly, White has not plausibly alleged a Fourth Amendment false arrest or false

imprisonment claim, and this claim will be dismissed.

### 2.    Excessive Force Claims

A constitutional claim of excessive force that occurs during an arrest is governed by the

Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[C]laims that law

enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop,

or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

'reasonableness' standard[.]"); *see also Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) ("In

an excessive force case, we determine whether a constitutional violation has occurred using the

Fourth Amendment's objective reasonableness test.").  "Courts determine whether the force used

is 'objectively reasonable' based on the totality of the circumstances, . . . and certain factors,

including: 'the facts and circumstances of each particular case, . . . the severity of the crime at

issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Klein v. Madison*,

374 F. Supp. 3d 389, 407 (E.D. Pa. 2019) (quoting *Graham*, 490 U.S. at 386)).

White alleges that after Upper Darby police officers surrounded the Property and

demanded he come out of the Property "with his hands up in the air," he complied as he made his

way to the basement. (Compl. at 12.) Once in the basement, he alleges Sergeant Doe, entered

the basement, maintaining a distance of about ten feet from White and ordered him "to lay face

down on the ground" while pointing a firearm at him. (*Id*. at 12-13.) White asserts he complied

with the order to lay down and alleges his "hands were tightly handcuffed behind his back" by

Sergeant Doe while he lied face down on the basement floor and "gave no resistance

whatsoever." (*Id*. at 13.) He was removed from the Property, patted down, then placed in the

police vehicle and transported to the police station, where he the handcuffs were subsequently

removed. (*Id*. at 14-15.) Although he was not aware at the time of his arrest, Upper Darby

police officers had also been at the Property earlier in the day when his friend was arrested for

trespassing. (*Id*. at 11.)

In evaluating the use of handcuffs, the Court must "look at the intrusiveness of all aspects

of the incident in the aggregate." *Baker v. Monroe Twp.,* 50 F.3d 1186, 1193 (3d Cir. 1995). In

*Kopec v. Tate,* 361 F.3d 772, 777 (3d Cir. 2004), the United States Court of Appeals for the

Third Circuit held where the handcuffs were so tight that the defendant began to faint from the

pain and lost feeling in his hand, resulting in permanent nerve damage in his right wrist,

warranted a finding of excessive force. *Id.* However, the Court cautioned that the opinion

should not be "overread" as it was not meant to open the "floodgates to a torrent of handcuff claims." *Id.* Merely alleging that the handcuffs were tight, as White has done in this case, does not warrant a finding of excessive force under *Kopec* and its progeny. *See id.* Based on White's detailed allegations, including the circumstances surrounding his encounter with the police officers, why he was approached by them, and how Sergeant Doe arrested him after he voluntarily lied down, these facts indicate that force of tightly placed handcuffs were objectively reasonable to conduct the arrest based on the totality of the circumstances. *See, e.g., Rivera v. Como*, 733 F. App'x 587, 591 (3d Cir. 2018) ("The amount of force was limited to that reasonably necessary to bring Rivera under control and to place handcuffs on him"); *Pagliaccetti v. City of Phila.*, No. 09-1106, 2010 WL 3222153, at *5 (E.D. Pa. Aug. 13, 2010) ("Merely alleging that the handcuffs were too tight, as plaintiff has done in this case, does not warrant a finding of excessive force" ). The factual allegations describe the normal course of an arrest without any indication that White suffered pain and/or an injury from the use of handcuffs, or more importantly, that the officers had any reason to believe that the use of handcuffs in the normal course of his arrest was causing him any pain.

White also alleges Sergeant Doe entered the basement after officers requested him to exit the Property and ordered him "to lay face down on the ground" while maintaining a distance of about ten feet from him and pointed a firearm at him. (Compl. at 12-13.) White asserts he complied with the order to lay down and was then handcuffed, escorted to the police car and transported to the station. Although the crime of trespassing alone does not likely warrant a safety concern, given the information available to the police officers, the decision to draw a firearm to safely arrest White inside the Property was justified by the circumstances. *See Armstrong v. Sherman,* No. 09–716, 2010 WL 2483911, at *4 (D.N.J. June 4, 2010) ("[P]ointing

a firearm at a person can constitute excessive force *if such action is not justified by the circumstances.*") (emphasis added); *see also Graham v. Connor,* 490 U.S. at 386, 396 (1989) ("[Making an arrest] necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it."). For instance, White alleges that officers told him that when his family members called the police, they relayed to them that White was in violation of a PFA Order, which is an order to protect someone from abuse.[9] Upper Darby Officers also had been present during his previous eviction from the Property based on that Order and knew another individual, his friend, was present at the Property earlier that day and was arrested for trespassing. He also admits the police asked him to exit the residence with his hands in the air prior to entering the basement. Importantly, White does not allege that the firearm was pointed at him after he was handcuffed or when he was transported to and detained at the police station. Sergeant Doe pointing the firearm at White while entering the basement to effectuate his arrest was objectively reasonable based on the totality of the circumstances, especially given Sergeant Doe was entering an unsecured space after White had been asked to exit the Property, and officers knew that a protection from abuse order was previously granted against him. *See, e.g., Pearson v. Krasley*, 715 F. App'x 112, 114 (3d Cir. 2017) (no plausible excessive force claim when officer pointed gun at the plaintiff and requiring him to lie on the ground during arrest for promoting prostitution); *Stiegel v. Peters Twp.,* 600 F. App'x 60, 67 (3d Cir. 2014) (finding that an officer drawing his handgun on suspects was reasonable in part because the officer's "use of

---

[9] *See United States v. Introcaso,* 506 F.3d 260, 263 n.1 (3d Cir. 2007) (citing 23 Pa. Cons. Stat. Ann. §§ 6107, 6108) ("The Pennsylvania Protection from Abuse Act, 23 Pa. Cons. Stat. Ann. § § 6101–22, allows a plaintiff to obtain a PFA order upon, *inter alia,* proof of abuse by a preponderance of the evidence at a hearing.")

his service and weapon was limited—he displayed it for a short amount of time and holstered it once the situation was under control."); *Mellott v. Heemer*, 161 F.3d 117, 123 (3d Cir. 1998) (concluding that "it was objectively reasonable for the marshals to load and point their weapons in an effort to discourage resistance and ensure their own safety"); *Cf. Baker v. Monroe Twp.,* 50 F.3d 1186, 1193–94 (3d Cir. 1995) (finding excessive force where police held suspect's family members, two of whom were minors, on the ground at gunpoint while they searched the alleged suspect's house).

White's allegations, taken as true, describe the officers' use of handcuffs and display of a firearm were justified by the circumstances to safely effectuate his arrest and nothing indicates that the force used was more than necessary given the totality of the circumstances. Therefore, these claims will be dismissed.[10]

### E.    Municipal Liability

White names Upper Darby Township as a defendant.[11]  As an initial matter, a municipality is not vicariously liable under § 1983 for the actions of its employees. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (holding that local governments can be liable as "persons"

---

[10] White references that "other officers who failed to intervene" are liable.  (Compl. at 18.)  To the extent he intended to bring a failure to intervene claim based on the alleged excessive force claim, such claim would also be dismissed based on the dismissal of the excessive force claim.  *See Bush v. Renegar*, No. 18-327, 2020 WL 5408065, at *10 (E.D. Pa. Sept. 9, 2020) (quoting *Lora-Pena v. Denney*, 760 F. Supp. 2d 458, 468 (D. Del. 2011) (cleaned up)) ("Although legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of the excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene.").

[11] White also names the Police Officer Defendants and Knowles in their official capacities.  Claims against these defendants in their official capacities are indistinguishable from the claims against Upper Darby, the governmental entity who employs them. *See Kentucky v. Graham,* 473 U.S. 159, 165-166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Thus, a suit against these defendants in their official capacities is duplicative of White's claims against Upper Darby and will be dismissed with prejudice.

under § 1983, but this liability extends only to "their *own* illegal acts" (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Rather, to plead a § 1983 claim against a municipality or municipal entity, a plaintiff must allege that the municipality or municipal entity's policy or custom caused the violation of his constitutional rights. See *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)). A plaintiff may also state a basis for municipal liability by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* But "[i]t is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (stating that if a municipal employee "inflicted no constitutional injury . . . , it is inconceivable that [the municipality] could be liable")). Because White has failed to plead any plausible underlying constitutional violation, it is inconceivable that the claim against Upper Darby is plausible and will be dismissed.[12]

---

[12] Even if White's allegations had amounted to plausible constitutional violations, he has failed to plead facts to support any *Monell* claim against Upper Darby. White does not sufficiently allege that the conduct of which he complains was caused by a municipal policy or custom, or municipal failures amounting to deliberate indifference. General allegations that simply paraphrase the standard for municipal liability do not support a plausible claim. *See*

**F.    State Law Claims**

Any state law claims will also be dismissed.  In the absence of any federal claims, the only independent basis for jurisdiction over state law claims is 28 U.S.C. § 1332(a), which grants a district court jurisdiction over a case in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." Section 1332(a) requires "complete diversity between all plaintiffs and all defendants," which "means that, unless there is some other basis for jurisdiction, 'no plaintiff [may] be a citizen of the same state as any defendant.'" *Lincoln Ben. Life Co.,* 800 F.3d at 104 (first quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005); then quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)).  An individual is a citizen of the state where they are domiciled, meaning the state where they are physically present and intend to remain.  *See Washington v. Hovensa, LLC*, 652 F.3d 340, 344 (3d Cir. 2011).

White asserts he is a citizen of Pennsylvania.  (*See* Compl. at 3.)  Although he does not allege the state citizenship for any of the Defendants, Upper Darby is located in Delaware County and several of the Defendants are employed by Upper Darby.  (*Id.* at 2-3.)  Therefore, it appears at least some of the Defendants are citizens of Pennsylvania and diversity jurisdiction is lacking over White's state law claims.

**IV.    CONCLUSION**

For the foregoing reasons, the Court will grant White leave to proceed *in forma pauperis* and dismiss the Complaint.  Leave to amend will not be given as any attempt to amend would be futile.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002).

---

*Szerensci v. Shimshock*, No. 20-1296, 2021 WL 4480172, at *7 (W.D. Pa. Sept. 30, 2021) ("Plaintiffs' conclusory allegation, which generally paraphrases the relevant standard, is insufficient to state a claim for § 1983 liability under *Monell*.") (citing cases).

An appropriate Order dismissing this case will be entered separately.  *See* Federal Rule of Civil Procedure 58(a).

BY THE COURT:

GAIL A. WEILHEIMER, J.